No. 12.—W. E. A. WALL *et al.* plaintiffs in error, *vs.* THOM-AS N. ARRINGTON, defendant.

[1.] Equity relieves against a *mistake,* as well as against fraud, in a deed or contract in writing, whether it be concerning land or any other thing ; and there is no difference in this respect, between that class of cases required by the Statute of Frauds to be in writing, and those not within the Statute ; and *parol* evidence is admissible to prove the mistake, though it be denied in the *answer.*

[2.] The fact that the complainant is a purchaser *with warranty,* does not bar his right to the relief which he seeks.

[3.] In *all* cases of *mistake* in written instruments, Courts of Equity will interfere, as between the original parties, or those claiming under them in privity, such as personal representatives, heirs, devisees, legatees, voluntary grantees, or *judgment creditors,* or purchasers from them with notice of the facts.

[4.] W. mortgaged certain lands to P. to secure him in the payment of a promissory note. The land was described through mistake, by a wrong number, 109 for 112. Afterwards certain creditors of W. obtained judg-

Wall *et al. vs.* Arrington.

ment against him, and caused the same to be levied on the land which had been sold under the mortgage and bought by the mortgagee, who took possession thereof. P. sold to L. and L. to A. the complainant, the error in the description of the premises being repeated through all the *mesne* conveyances : *Held,* that Equity has authority to correct the mistake in the title, and free the land from the lien of the judgment.

[5.] As against *bona fide* purchasers for a valuable consideration without notice, Courts of Equity in such cases, will grant no relief; they have an equal equity to the protection of the Court.

[6.] A bill filed to correct a mistake in a written instrument, and to reform the contract, should aver expressly that the instrument as it is, differs from the intention of the parties, and state particularly wherein it does differ.

[7.] A Court of Chancery, while it has authority, is very slow in exerting it to reform alleged mistakes in written instruments; and it requires the clearest and strongest evidence to establish the mistake. It is not sufficient, that there may be some reason to presume a mistake ; the evidence must be clear, unequivocal, and decisive.

[8.] Courts are liberal in allowing mistakes to be corrected, where they are clearly established, notwithstanding the acquiescence of the party, provided no injury has resulted in the meantime to the person against whom the relief is sought, or those claiming under them.

[9.] After the lapse of forty-four years, Equity will refuse to interfere, especially against an innocent purchaser.

[10.] Where only nine years have intervened, and the complainant has been in actual possession all the time, though under an erroneous deed, and the defendant has not been prejudiced, there is no pretext to stop the application for relief, on the ground of want of diligence.

In Equity, in Twiggs Superior Court. Tried before Judge POWERS. September Term, 1852.

In the year 1835, William Johnson sold lot of land number 112, in the 28th district of Twiggs County, to Wm. E. A. Wall, who afterwards, to wit, in 1840, executed a mortgage deed to the north-east half of said lot, to Ira Peck, to secure the payment of $300.00, and in drafting the mortgage, the said lot was described as being number 109, instead of 112.

The mortgage was afterwards foreclosed and the land sold, when Peck became the purchaser, and the Sheriff executed him a deed, in which the same mistake as to the number of the lot was made. In 1845, Peck sold and conveyed the land to Na-

than Land, and in the deed, the same number, 109, was inserted. In 1847, Land sold and conveyed the land to complainant, Thomas Arrington, and in the deed the lot was properly described as being number 112.

Afterwards Peyton Reynolds caused the land to be levied on by *fi. fas.* younger than the mortgage deed, which had been transferred to him by one Amos Ofmy, and against T. C. Reynolds, Wm. E. A. Wall and Peyton Reynolds, security. Complainant, Arrington, filed his claim to the land, and pending the claim filed his bill in Equity, alleging the above stated facts, and praying the Court to reform and correct the several deeds and the mortgage in which the mistake relative to the number of the lot of land had been made.

The answers of the several defendants, substantially admitted the facts as charged in the bill, and on the trial were read in evidence. The complainant also proved that Wall, Peck, Land, and complainant, had been in successive possession of said lot, 112, for many years, and that Wall never owned lot number 109.

Counsel for defendant requested the Court to charge the Jury—

1st. That if there had been any negligence, or if the complainant had not shown due diligence, he was not entitled to have the alleged mistake corrected.

2d. That inasmuch as the complainant had a warrantee deed from Nathan Land, he was not injured by the alleged mistake, and was not entitled to have it corrected.

3d. That inasmuch as Peyton and Charles Reynolds, were judgment creditors of Wall and had no notice or knowledge of the alleged mistake, the mistake could not be corrected as against them.

4th. That inasmuch as the complainant showed no contract in writing for the conveyance or mortgaging of lot 112, he was not entitled to the relief prayed for.

5th. That a Court of Equity could not and would not reform a deed, by inserting therein a separate and distinct lot of land from the one embraced in the deed.

The Court refused to give the charge as requested, and counsel for defendant excepted, and has assigned error.

C. B. COLE, for plaintiff in error.

POE & NISBET, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

The questions in this case are all made by the refusal of the Court to charge as requested by the defendant's counsel. I shall take up the points in their natural order, and not as they stand in the bill of exceptions.

[1.] The 4th and 5th grounds are the same in substance, and the proposition which they assert is, that *parol proof* is inadmissible to correct mistakes in bonds, deeds of mortgage and other contracts, respecting lands.

Chancellor *Kent,* in 1817, thirty-six years ago, declared that it had been the steady language of the English Chancery for the last seventy years preceding that period, and of all the compilers of the doctrines of that Court, that a party may be admitted to shew by verbal evidence a mistake as well as fraud in the execution of a deed or other writing. *Gillespie and Wife vs. Moon,* 2 *Johns. Ch. Rep.* 585. And accordingly in that case, he decreed that the defendant release to the plaintiffs the title to 50 acres of land, which was included in the conveyance made to him by an error in the description of the land. And a stronger case than this could not arise. For the mistake was most positively denied in the answer to the bill brought to rectify it; and the oral testimony was received in opposition to the plain language of the deed as well as to the defendant's answer.

After citing this case with emphatic approval, in one of the first and most elaborate opinions delivered by this Court, to wit, *Rogers vs. Atkinson et al.* (1 *Kelly,* 12,) and ruling explicitly that as it respects the right of a Court of Chancery to rectify mistakes and reform written contracts, there was no

Wall *et al. vs.* Arrington.

difference between that class of cases required by the Statute of Frauds to be in writing and those not within the Statute, we flattered ourselves that this principle at least, would have been considered as settled.    But we were mistaken.

The broad question was again made in *Trout vs. Goodman*, (7 *Geo. R.* 383.)    And notwithstanding we believed that the parol evidence, which consisted of the declarations of the vendor made subsequent to the sale, ought *not*, under the circumstances, to have prevailed against the answer of the defendant, denying the alleged mistake, still as we were with the defendant in error as to the competency of the proof, and the matter of its sufficiency was a question alone for the Jury, its weight in this, as in all other cases, being their business, and not ours, we refused to disturb the verdict.    By it, the vendee obtained a decree for sixty acres of land more than was embraced in the boundary lines, as set forth in his bond for titles.

The subsequent renewal of this subject, satisfies us that we may despair of ever looking upon it as *res adjudicata*, in our day.    Perhaps our successors, abounding more both in reason and authority than ourselves, as well as it respects this as other questions so repeatedly and perseveringly brought up for re-hearing and re-adjudication, may be more fortunate, because more successful in giving rest to the land.

It only remains for us to pronounce, which we accordingly do, that in our humble opinion the parol proof in this case was competent and admissible ; and we will add that it establishes most clearly and conclusively the fact of the mistake, as charged in the bill.

[2.] Does the fact that the complainant had a warrantee deed from Nathan Land, his vendor, deprive him of the relief which he seeks ?

Would it be equitable to turn Arrington over upon Land ? On the contrary, is not Land, who is before the Court, entitled to have this correction and reformation made for his benefit ? He was an innocent purchaser from Peck, as Peck was under the mortgage from Wall, without notice of the error in the number of the lot.    What justice would there be in relieving

Arrington at his expense? None. On the contrary, all who hold under the mortgage sale, have equal claims upon a Court of Chancery to have this mistake corrected, for the benefit of each and all of them.

[3.] But it is said that inasmuch as Peyton and Charles Reynolds, were *judgment creditors* of Wall, and had no notice or knowledge of the alleged mistake, that it cannot be corrected as against them.

The authority of Judge *Story* is in opposition to this position. He says that in *all* cases of mistake in written instruments, Courts of Equity will interfere as between the original parties, or those claiming under them in privity, such as personal representatives, heirs, devisees, legatees, voluntary grantees, or *judgment creditors*, or purchasers from them with notice of the facts. 1 *Stor. Eq.* §165. See also, *Burgh vs. Francis*, 1 *Eq. Cas. Abr.* 320. *Taylor vs. Wheeler*, 2 *Vernon*, 564. *Finch vs. The Earl of Winchelsea*, 1 *P. Williams*, 277. *In the matter of Howe*, 1 *Paige*, 125. *White and others, vs. Wilson and another*, 6 *Black.* 448.

[4.] This last case was very similar in all respects, to the present. Hunt, one of the defendants, mortgaged certain lands to the complainants. A tract intended to be included, was omitted by mistake. Subsequent to the mortgage, certain creditors of Hunt obtained judgment against him and threatened to levy on the land which by mistake had been left out of the mortgage. The Supreme Court of Indiana *held* that a Court of Chancery had authority to correct the mistake in the mortgage, and free the omitted tract from the lien of the judgment.

The case of the *United States vs. Monroe et al.* (5 *Mason's Rep.* 572,) is relied on as authority in conflict with the opinion in Judge *Story's* Commentaries that mistakes may be corrected as against *judgment creditors*. Let us examine it and see.

Samuel Langton had assigned his effects to Washington Monroe and Elijah Loring. Subsequent to the assignment, Monroe became insolvent, and made an assignment of all his

property, including all that passed for his benefit, under the assignment from Langton.   A bill was brought by the *United States* against *Monroe and Loring,* to enforce their right of priority of payment of debts out of the effects of Langton, and for this purpose, to show that it was the intention of all the parties to the assignment made by Langton, that the clause providing for the priority of payment of custom-house bonds due to the United States, should apply to *all* the bonds of Langton then owing to the custom-house, and not as the terms of the assignment plainly purported, to those bonds only upon which Monroe was surety.

Judge *Story* decided, and very properly, and in entire consistency with the doctrine quoted from his *Equity Jurisprudence,* that the assignees and creditors of Monroe were essentially interested in the litigation, and should have been made parties to the bill; and suggested as a reason for this opinion, that they might have released their debts upon the faith of the validity of the assignment from Langton in its original shape; and that unless they had some notice of the alleged mistake, it would be very difficult, even if they were before the Court, to reform the assignment from Langton to Monroe, to their prejudice.

[5.] And so we think.   Innocent purchasers under the judgment of Ofmy against Wall, which was transferred to the Messrs. Reynolds, would be entitled to protection against this mistake.   It is true that ingenious suppositions are made in argument, to show how, by possibility, these *judgment creditors* may have been injured; still no attempt was made on the trial below to establish any actual loss.

[6.] Before dismissing this branch of the case, I would remark, that Judge *Story* takes occasion in this opinion, in 5 *Mason,* to state the rule as to the manner of alleging the mistake in a bill brought for its correction, as well as the degree of proof necessary to obtain a decree.   He says:

" If the bill seeks to correct an asserted mistake in the language of the instrument, differing from the intention of the parties, and reform the instrument and obtain the consequent

relief, it is not sufficient to allege generally that the intention was different; but there must be an express averment that the instrument, as existing, differs from the intention of the parties—stating the particulars—and the bill must conclude with a prayer for the correction of the mistake and decree according to the reformed instrument."

[7.] "In cases of asserted mistake in written instruments, it is not denied that a Court of Equity has authority to reform the instrument. But such a Court is very slow in exerting such an authority; and it requires the strongest and clearest evidence to establish the mistake. It is not sufficient that there may be some reason to presume a mistake. The evidence must be clear, unequivocal, and decisive; not evidence which hangs equal or nearly *in equilibrio.*"

[8.] But it is again argued that if the complainant has not shown due diligence, he is not entitled to the relief which he seeks.

The law upon this subject, was fully and fairly given in charge to the Jury. The mortgage from Wall to Peck, in which the mistake as to the No. of the lot first occurred, No. 109 having been accidentally substituted for No. 112, by the scrivener who drafted the deed. I say this mortgage bears date in 1840. In 1844 the land was sold under the mortgage foreclosure, and bought in by Peck, who took a Sheriff's title, in which the same error occurs. The ensuing year, 1845, Peck sold to Land, still continuing the misdescription. Land conveyed to Thomas N. Arrington, the complainant, in 1847, each vendor referring to the previous deeds for a description of the premises, and consequently each perpetuating the mistake; and it was not until the assignee of the plaintiff in *fi. fa.* in 1849, detected the defect in the conveyances and caused the land to be levied on, that it come to the knowledge of those parties, who resorted immediately to Equity for relief.

His Honor, the Circuit Judge, instructed the Jury, that if the complainant upon this state of facts, had been *in any way* negligent or had not manifested due diligence, the mistake

could not be corrected, especially if injury had resulted to any of the parties by his carelessness.

In *Gillespie and Moon*, the trustee sold in 1799, and died in 1814, without taking any measures to have the mistake corrected, although she expressed her intention to do so in 1806 ; and the *cestui que trust*, immediately after her death, filed a bill for relief against the mistake. Counsel insisted, that as no step was taken by the trustee for fifteen years while she lived, but she looked on in silence during all this period, and that too, when she knew that the defendant was in possession of the whole lot, and was improving the 50 acres in dispute, as his own property, that such gross negligence on her part ought to stop any application for relief.

But the Chancellor held that there was no pretext even for the suggestion of any delay or acquiescence injurious to the just rights of the plaintiff, and added, that Courts had been liberal on this head.

In *East vs. Thornbury*, (3 *P. Wms.* 126,) a mistake was rectified after seven years' acquiescence.

[9.] It is true that in *Bell vs. Cundale*, (1 *Ambler*, 101,) Lord *Hardwicke*, in 1750, refused to rectify a mistake in the body of a common recovery of a copy-hold estate suffered at a Court Baron, held for the Manor of Rippon in 1706, where the name of the vouchee was inserted instead of that of the tenant. But here 44 *years had elapsed;* and it appeared on the pleadings that the remainder-man upon the foot of the mistake in the recovery, had got possession of the estate *and had sold it to a purchaser for a valuable consideration, without notice.*

[10.] Here, Wall never owned lot No. 109, but did purchase of one Johnson, and occupy No. 112, until he was dispossessed under the judicial sale, in 1844 ; when Wall went out, and Peck and those claiming under him, went into possession of the right lot, and have continued to hold and occupy the same ever since.

We may well say, that there is no acquiescence here to bar the complainants.

One word in reply to the argument, that it is not competent

for a Court of Chancery to free lot No. 112, from the judgment lien acquired at Law by Ofmy and his assignees.

If it be in the power of Courts of Equity to correct mistakes in contracts, not only as between the original parties, but also as against the *judgment creditors* of one of them, and we have endeavored to show that this jurisdiction rightfully belongs to Courts of Chancery, then it was lot No. 112, and not lot No. 109, that was mortgaged by Wall to Peck, in 1840, and the mortgage lien on lot No. 112 is older than the lien at Law of Ofmy and his assignees upon lot No. 112; and therefore the sale under it passed the legal title to the purchaser.