·ROBINSON, NORTON & CO. *et al. v.* NORTON, receiver.

A mortgage covering a stock of groceries described as being located in a designated store has no lien upon a stock of groceries and other merchandise stored in another and different building used by the mortgagor as a warehouse, merely because the articles composing this latter stock were first received into the store and thence removed to the warehouse, none of them, however, in fact becoming a part of the "stock" kept for sale in the store until brought back thereto for that purpose. Were it otherwise as to the "groceries," it would, after their destruction by fire, be incumbent upon the mortgagee, in order to successfully assert an equitable lien upon the proceeds of insurance policies which he alleged had been taken out for his benefit upon the mortgaged goods, to show with reasonable certainty the value of the insured groceries which had been destroyed.

Argued June 16,—Decided July 28, 1899.

Injunction.    Before Judge Fite.    Whitfield county.    June 1, 1899.

*R. J. & J. McCamy,* for plaintiffs in error.
*Jones & Martin,* contra.

LUMPKIN, P. J.    A petition for injunction was filed by J. C. Norton, as receiver of the assets of Thomas J. Peeples, against C. C. Bemis and certain named fire-insurance companies, to restrain them from paying "to said Bemis, his counsel, or any other person claiming under or through him," the money alleged to be due upon certain policies which had been issued to him.    Subsequently these companies, under an order of the judge, paid the money to an attorney at law to be held subject to the further order of the court, and were discharged from the litigation.    At the interlocutory hearing, J. M. Robinson, Norton & Co., and others, creditors of Bemis, intervened and were made parties.    The receiver claimed the fund on the ground that Peeples had an equitable lien thereon, arising, as alleged, in the following manner: Bemis, for the purpose of securing to

Peeples the payment of two promissory notes amounting to $5,000, besides interest, had executed and delivered to the latter a mortgage upon certain goods, with an agreement to insure the same for his benefit. This was done; the insured goods were afterwards destroyed by fire, and the money now in controversy is the proceeds of the policies by which the insurance stipulated for by Peeples was effected. The intervenors claimed under assignments from Bemis to them of the policies in question. These assignments were executed after the destruction of the goods. After hearing evidence and argument, the judge below held that the receiver was entitled to the fund, and accordingly granted an injunction restraining the payment thereof to the intervenors; and they excepted. The bill of exceptions presents several questions, but the case, upon facts as to which there is practically no dispute, is controlled by the propositions announced in the headnote, and we will limit our discussion accordingly. In the mortgage which Bemis gave to Peeples he described the property upon which it was to operate as "my entire stock of groceries now in my store on the east side of Hamilton street, Dalton, in said county." According to the sworn petition, Bemis, after executing the mortgage, "secured a wareroom just south of his salesroom some three hundred feet, or thereabouts, and as he would receive goods in quantities not convenient or desirable to keep in his salesroom, he would transfer them to his wareroom, first passing them through and making them a part of his stock of goods in his salesroom." The wareroom was a building in the same block with the salesroom and had been previously used by another merchant. The goods destroyed by fire were in the wareroom, and consisted of groceries, dry goods, notions, etc. At the time the mortgage was given, the store above designated as the "salesroom" was the only building occupied by the mortgagor. The evidence showed that Bemis, after he began to use the wareroom, would, on receiving consignments of goods in bulk or in large quantities, have them placed temporarily in the salesroom, "some being retained for use in selling and others carried through the salesroom to the wareroom and brought back as needed." It also appears that some of the stock of goods in the

salesroom at the time of the execution of the mortgage were,
for convenience, afterwards moved into the wareroom, but the
value of the same was not shown nor does it appear that they
were not returned to the salesroom before the fire.

From the foregoing it will readily be seen that the physical
situation of the wareroom was in no sense such as to justify
a holding that it was merely an annex, or addition to, or inte-
gral part of the salesroom.   The buildings were entirely sepa-
rate and distinct, and could not, of course, be regarded as parts
of one and the same house.   According to the literal import
of the descriptive words used in the mortgage, it covered only
such groceries as were in the store of Bemis, i. e. the salesroom,
on the date of its execution.   Doubtless, however, it was the
intention of the parties that the mortgage should attach to the
stock of groceries—as distinguished from the various articles
composing that stock—which the mortgagor then had, or
might thereafter keep, in the "store" designated.   That is to
say, the parties evidently intended to respectively give and re-
ceive a mortgage upon a stock of groceries constantly chang-
ing in specifics, so as to enable the mortgagor to carry on his
business and sell goods to customers, in due course of trade,
free from any incumbrance or lien.   The mortgagee necessa-
rily, therefore, relied on the good faith of the mortgagor to
keep up a stock of groceries approximating in value that on
hand at the date of the mortgage.   If this should not be done,
however, the mortgagee would be remediless; for, no matter
how many goods of this character the mortgagor might there-
after buy, the mortgage lien could not attach thereto until
such goods actually became part and parcel of the stock kept
in the store, such being essentially the terms of the contract
as written, which made the test of lien the location, in a cer-
tain definitely described building, of a stock of groceries be-
longing to the mortgagor.   It follows that the mortgage created
a lien on such groceries only as constituted the original stock
or were subsequently actually added to the same.   The evi-
dence shows that the goods carried through the salesroom were
not intended to be at once added to the stock kept therein.
On the contrary, the salesroom was inadequate to receive and

hold them as "stock," and another building was secured in which it was designed to store these purchases until such future time as required their addition to the stock kept in the sales-room. The mortgage attached, not to all purchases made by Bemis, but only to such groceries as he might thereafter actu-ally set apart and add to the stock kept in this particular store. The purchases were not, in point of fact, immediately added, but were kept elsewhere until needed, and then given a final and irrevocable location (except as to bona fide sales) in the store. The mere transit of the goods through the store on their way to the wareroom could not operate to make them a part of the "stock," and until they did become a part thereof the mort-gage lien could not attach.

This case differs from that of *Wardlaw* v. *Mayer*, 77 *Ga.* 620. In that case there was a mistake in the mortgage, and the in-strument was reformed, the court ruling that formal correction was not essential. It was, however, clear beyond controversy that the mortgagor intended to mortgage the goods the pro-ceeds of which were in dispute. That was the controlling point. That case really turned on the question of intention, and so does this. After a careful consideration of the evidence, we do not think Bemis intended that the mortgage he gave to Peeples should cover any goods, purchased after the execution of the mortgage, while they were stored in the warehouse.

Again, as this mortgage expressly covered a stock of gro-ceries only, it certainly created no lien upon dry goods, notions, etc., and could not, therefore, be made the basis of a claim to an equitable lien upon the proceeds of insurance policies aris-ing from the payment of a loss upon goods of the character last mentioned. Peeples does, by affidavit, testify that he had a mortgage upon the entire stock of goods, but he could not, of course, thus contradict or add to the terms of the mortgage, which was in evidence and spoke for itself. In this connection it is also proper to note that the petition in this case alleges that the mortgage was upon the "entire stock of groceries" in the store of Bemis. There was no evidence showing with any degree of certainty what was the value of the burned groceries or what amount of insurance money was realized thereon. The

plaintiff furnished no data whatever from which his claims to the proceeds of the policies, based on the loss of these groceries, could be reduced to dollars and cents. The same thing is true as to the particular lots of groceries, if any, which were in the store when the mortgage was given and which were subsequently carried to the wareroom. Even if the mortgage lien attached to these after removal, there is no proof of their quantity or value; nor, as above shown, is it at all certain that in due course of business they were not returned to the salesroom before the fire. The case then is simply this: Peeples had a mortgage covering a stock of groceries in a designated building. His receiver contends that the lien of this mortgage attached to a stock of goods, including groceries and other merchandise, located in another and distinct building. These goods merely passed through the store mentioned in the mortgage, and, with the possible exception of a few articles, had never in fact become a part of the stock therein contained. The receiver further contends that the mortgaged goods having been insured for the benefit of the mortgagee and having been destroyed by fire, he has an equitable lien upon the proceeds of the policies. The first contention is not maintainable, and therefore the receiver's entire claim must fall. The mortgage certainly had no lien on anything but groceries, and we do not think its lien attached to the groceries in the wareroom, except possibly as to those, if any, which had actually constituted a part of the stock originally kept in the store. But even if the mortgage lien attached to all the groceries in the wareroom, it was, as has been seen, impossible, under the evidence, to arrive at any amount for which the lien was enforceable. A plaintiff must make out his case by evidence showing with at least reasonable certainty his right to the relief for which he prays. As the receiver failed to do this, the court erred in granting the injunction.

*Judgment reversed.    All the Justices concurring.*